

U.S. Department of Justice

*United States Attorney*
*District of Connecticut*

*Connecticut Financial Center*     *Telephone: (203)821-3700*
*157 Church Street, Floor 25*       *Fax: (203) 773-5376*
*New Haven, Connecticut 06510*

April 28, 2015

Richard C. Marquette, Esq.
60 Washington Ave., #302
Hamden, CT 06518

United States District Court
District of Connecticut
FILED AT   NEW HAVEN
*april 28*  20 15
Roberta D. Tabora, Clerk
By *P. A. Villano*
Deputy Clerk

Re:   **United States v. Ryan Geddes**
       **Criminal No. 3:14CR228(JBA)**

Dear Mr. Marquette:

    This letter confirms the plea agreement between your client, Ryan Geddes (the "defendant"), and the United States Attorney's Office for the District of Connecticut (the "Government" or "this Office") concerning the above-referenced criminal matter.

## THE PLEA AND OFFENSE

    Ryan Geddes agrees to plead guilty to Counts One, Three, and Seven of the indictment, charging him with, respectively, conspiracy to commit bank fraud, in violation of 18 U.S.C. § 1349 (Count One), and conspiracy to commit mail and wire fraud, in violation of 18 U.S.C. § 1349 (Counts Three and Seven). He understands that, to be guilty of these offenses, the following essential elements of each offense must be satisfied:

Conspiracy to Commit Bank Fraud (Count One):

1. Two or more persons, in some way or manner, agreed to try to accomplish a common and unlawful plan to commit bank fraud, specifically:

    a. The defendant and one or more other persons knowingly planned a scheme to obtain, by material false or fraudulent representations or promises, monies under the control of one or more financial institution(s);

    b. The defendant did so with the intent to defraud the financial institution(s); and

   c. The targeted financial institution was, during the time of the scheme, insured by the Federal Deposit Insurance Corporation or chartered by the United States.

2. The Defendant knew the unlawful purpose of the plan and willfully joined in it.

Conspiracy to Commit Mail and Wire Fraud (Counts Three and Seven):

1. Two or more persons, in some way or manner, agreed to try to accomplish a common and unlawful plan to commit mail or wire fraud, specifically:

   a. The defendant and one or more other persons, for the purpose of executing a scheme to obtain monies by material false or fraudulent representations or promises, planned either to place or cause to be placed any matter or thing in the United States mail or in the custody of any interstate mail carrier (mail fraud); or planned to cause signs or signals to be transmitted by means of wire communication in interstate or foreign commerce (wire fraud); and

   b. The defendant did so with the intent to defraud.

2. The Defendant knew the unlawful purpose of the plan and willfully joined in it.

**THE PENALTIES**

Counts One, Three, and Seven of the indictment carry the following maximum penalties: Count One, thirty years imprisonment and a $1,000,000 fine; and each of Counts Three and Seven, twenty years imprisonment and a $250,000 fine. In addition, under 18 U.S.C. § 3583, the Court may impose terms of supervised release of, respectively, not more than five years on Count One and not more than three years on Counts Three and Seven, such terms to begin at the expiration of any term of imprisonment.

The defendant understands that, should he violate any condition of the supervised release, he may be required to serve a further term of imprisonment of up to three years on Count One, and up to two years on Counts Three and Seven, with no credit for time already spent on supervised release.

The defendant also is subject to the alternative fine provision of 18 U.S.C. § 3571. Under this section, the maximum fine that may be imposed on the defendant for each count is the greatest of the following amounts: (1) twice the gross gains to the defendant resulting from the offense; (2) twice the gross losses resulting from the offense; (3) $250,000; or (4) the amount

specified in the section defining the offense, which is $1,000,000 for Count One, and $250,000 for each of Counts Three and Seven.

In addition, the defendant is obligated by 18 U.S.C. § 3013 to pay a special assessment of $100 on each count of conviction. The defendant agrees to pay the special assessment to the Clerk of the Court on the day the guilty plea is accepted.

The defendant is also subject to restitution, as discussed below. Unless otherwise ordered, should the Court impose a fine or restitution of more than $2,500 as part of the sentence, interest will be charged on the unpaid balance of the fine or restitution not paid within 15 days after the judgment date. 18 U.S.C. § 3612(f). Other penalties and fines may be assessed on the unpaid balance of a fine or restitution pursuant to 18 U.S.C. § 3572 (h), (i) and § 3612(g).

### Restitution

In addition to the other penalties provided by law, the Court must also order that the defendant make restitution under 18 U.S.C. § 3663A, and the Government reserves its right to seek restitution on behalf of victims consistent with the provisions of § 3663A. The scope and effect of the order of restitution are set forth in the attached Rider Concerning Restitution. Restitution is payable immediately unless otherwise ordered by the Court.

## THE SENTENCING GUIDELINES

### Applicability

The defendant understands that the Court is required to consider any applicable Sentencing Guidelines as well as other factors enumerated in 18 U.S.C. § 3553(a) to tailor an appropriate sentence in this case and is not bound by this plea agreement. The defendant agrees that the Sentencing Guideline determinations will be made by the Court, by a preponderance of the evidence, based upon input from the defendant, the Government, and the United States Probation Office. The defendant further understands that he has no right to withdraw his guilty plea if his sentence or the Guideline application is other than he anticipated, including if the sentence is outside any of the ranges set forth in this agreement.

### Acceptance of Responsibility

At this time, the Government agrees to recommend that the Court reduce by two levels the defendant's adjusted offense level under § 3E1.1(a) of the Sentencing Guidelines, based on the defendant's prompt recognition and affirmative acceptance of personal responsibility for the offense. Moreover, should the defendant qualify for a decrease under 3E1.1(a) and his offense level determined prior to the operation of subsection (a) is level 16 or greater, the Government will file a motion with the Court pursuant to §3E1.1(b) which recommends that the Court reduce the defendant's Adjusted Offense Level by one additional level based on his prompt notification

of his intention to enter a plea of guilty. The defendant expressly understands that the Court is not obligated to accept the Government's recommendations on the reductions.

The above-listed recommendations are conditioned upon the defendant's affirmative demonstration of acceptance of responsibility, by (1) truthfully admitting the conduct comprising the offense(s) of conviction and truthfully admitting or not falsely denying any additional relevant conduct for which the defendant is accountable under Sentencing Guideline § 1B1.3, and (2) truthfully disclosing to the Probation Office personal information requested, including the submission of a complete and truthful financial statement detailing the defendant's financial condition.

In addition, the Government expressly reserves the right to seek denial of the adjustment for acceptance of responsibility if the defendant engages in any acts, unknown to the Government at the time of the signing of this agreement, which (1) indicate that the defendant has not terminated or withdrawn from criminal conduct or associations (Sentencing Guideline § 3E1.1); (2) could provide a basis for an adjustment for obstructing or impeding the administration of justice (Sentencing Guideline § 3C1.1); or (3) constitute a violation of any condition of release. Moreover, the Government reserves the right to seek denial of the adjustment for acceptance of responsibility if the defendant seeks to withdraw his plea of guilty or takes a position at sentencing, or otherwise, which, in the Government's assessment, is inconsistent with affirmative acceptance of personal responsibility. The defendant understands that he may not withdraw his plea of guilty if, for the reasons explained above, the Government does not make one or both of the recommendations or seeks denial of the adjustment for acceptance of responsibility.

Stipulation

Pursuant to § 6B1.4 of the Sentencing Guidelines, the defendant and the Government have entered into a stipulation, which is attached to and made a part of this plea agreement. The stipulation includes both the offense conduct underlying Counts One, Three, and Seven of the indictment, and additional relevant conduct underlying Count Two and Counts Four through Six of the indictment. The defendant understands that this stipulation does not set forth all of the relevant conduct and characteristics that may be considered by the Court for purposes of sentencing. The defendant understands that this stipulation is not binding on the Court. The defendant also understands that the Government and the United States Probation Office are obligated to advise the Court of any additional relevant facts that subsequently come to their attention.

Partial Guideline Stipulation

The parties agree as follows:

The Guidelines Manual in effect on the date of sentencing is used to determine the applicable Guidelines range.

On Count One, as directed by U.S.S.G. § 2X1.1 (conspiracy), the applicable guideline is section 2B1.1. The defendant's base offense level under section 2B1.1(a)(1) is seven. The parties reserve their respective rights to argue what the loss amount is for Count One. The parties agree that two levels are added under section 3B1.1(c), for defendant's role as an organizer/leader for the Count One criminal activity, which involved less than five participants. Based on the relevant conduct regarding a false promissory note, two levels are added under section 3C1.1, Note 4(C), for obstruction of the investigation of this offense. Three levels are subtracted under section 3E1.1 for acceptance of responsibility, as noted above.

On Count Three, as directed by U.S.S.G. § 2X1.1 (conspiracy), the applicable guideline is section 2B1.1. The defendant's base offense level under section 2B1.1(a)(1) is seven. The parties reserve their respective rights to argue what the loss amount is for Count Three. The parties agree that two levels are added under section 3B1.1(c), for defendant's role as an organizer/leader for the Count Three criminal activity, which involved less than five participants. Three levels are subtracted under section 3E1.1 for acceptance of responsibility, as noted above.

On Count Seven, as directed by U.S.S.G. § 2X1.1 (conspiracy), the applicable guideline is section 2B1.1. The defendant's base offense level under section 2B1.1(a)(1) is seven. The parties reserve their respective rights to argue what the loss amount is for Count Seven. The parties agree that two levels are added under section 3B1.1(c), for defendant's role as an organizer/leader for the Count Seven criminal activity, which involved less than five participants. Based on the relevant conduct regarding certain bankruptcy court filings, two levels are added under section 3C1.1, Notes 1, 4(C), and 4(F), for obstruction of the investigation of this offense. Three levels are subtracted under section 3E1.1 for acceptance of responsibility, as noted above.

Under the sentencing guidelines' grouping rules of U.S.S.G. Chap. 3, Part D, all three Counts are grouped together under section 3D1.2(d). Accordingly all three counts form one group.

Under section 3D1.3(b), the offense level for the three fraud counts is calculated under section 2B1.1 from the aggregate loss of the Counts. Under section 2B1.1, the combined fraud counts have a base offense level of seven. The parties agree that 16 levels are added because the cumulative loss range for the grouped counts under section 2B1.1(b)(1) is more than $1,000,000 but not more than $2,500,000. The parties agree that there is an aggravating role enhancement under U.S.S.G. § 3B1.1; and the parties reserve their respective rights to argue whether that enhancement is four levels under subsection 3B1.1(a), for criminal activity involving five or more participants; or two levels under subsection 3B1.1(c), for criminal activity involving fewer than five participants. Two levels are added for obstruction of justice under section 3C1.1, note 8. Three levels are subtracted for acceptance of responsibility. The total, grouped offense level remains to be determined.

Based on an initial assessment, the parties agree that the defendant falls within Criminal History Category One. The parties reserve the right to recalculate the defendant's Criminal History Category and corresponding sentencing ranges if this initial assessment proves inaccurate.

The defendant reserves his right to seek a departure or non-Guidelines sentence, and the Government reserves its right to object and seek whatever sentence it deems appropriate.

The defendant expressly understands that the Court is not bound by this partial agreement on the Guideline ranges specified above. The defendant further understands that he will not be permitted to withdraw the plea of guilty if the Court imposes a sentence based on calculations different from those set forth in the partial guidelines stipulation.

In the event the Probation Office or the Court contemplates any sentencing calculations different from those stipulated by the parties, the parties reserve the right to respond to any inquiries and make appropriate legal arguments regarding the proposed alternate calculations. Moreover, the Government expressly reserves the right to defend any sentencing determination, even if it differs from that stipulated by the parties, in any post-sentencing proceeding.

### Partial Waiver of Right to Appeal or Collaterally Attack Conviction and Sentence

The defendant acknowledges that under certain circumstances he is entitled to challenge his conviction and sentence. The defendant agrees not to appeal or collaterally attack his conviction in any proceeding, including but not limited to a motion under 28 U.S.C. § 2255 and/or § 2241. Nor will he pursue such an appeal or collateral attack to challenge the sentence imposed by the Court if that sentence does not exceed 63 months imprisonment, five years of supervised release, a fine of $100,000, and a $300 special assessment, even if the Court imposes such a sentence based on an analysis different from that specified above. Similarly, the Government will not appeal a sentence imposed within or above the stipulated sentencing range. The Government and the defendant agree that this waiver applies regardless of whether the term of imprisonment is imposed to run consecutively to or concurrently with, in whole or in part, the undischarged portion of any other sentence that has been imposed on the defendant at the time of sentencing in this case. The defendant acknowledges that he is knowingly and intelligently waiving these rights. Furthermore, the parties agree that any challenge to the defendant's sentence that is not foreclosed by this provision will be limited to that portion of the sentencing calculation that is inconsistent with (or not addressed by) this waiver. Nothing in the foregoing waiver of appellate and collateral review rights shall preclude the defendant from raising a claim of ineffective assistance of counsel in an appropriate forum.

### Information to the Court

The Government reserves its right to address the Court with respect to an appropriate sentence to be imposed in this case. Moreover, the Government will discuss the facts of this case, including information regarding the defendant's background and character, 18 U.S.C. § 3661, with the United States Probation Office and will provide the Probation Officer with access to material in its file, with the exception of grand jury material.

## WAIVER OF RIGHTS

### Waiver of Trial Rights and Consequences of Guilty Plea

The defendant understands that he has the right to be represented by an attorney at every stage of the proceeding and, if necessary, one will be appointed to represent him.

The defendant understands that he has the right to plead not guilty or to persist in that plea if it has already been made, the right to a public trial, the right to be tried by a jury with the assistance of counsel, the right to confront and cross-examine the witnesses against him, the right not to be compelled to incriminate himself, the right to testify and present evidence, and the right to compel the attendance of witnesses to testify in his defense. The defendant understands that by pleading guilty he waives and gives up those rights and that, if the plea of guilty is accepted by the Court, there will not be a further trial of any kind.

The defendant understands that, if he pleads guilty, the Court may ask him questions about each offense to which he pleads guilty, and if he answers those questions falsely under oath, on the record, and in the presence of counsel, his answers may later be used against him in a prosecution for perjury or making false statements.

### Waiver of Statute of Limitations

The defendant agrees that, should the conviction following defendant's plea of guilty pursuant to this plea agreement be vacated for any reason, then any prosecution that is not time-barred by the applicable statute of limitations on the date of the signing of this plea agreement (including any indictment or counts the Government has agreed to dismiss at sentencing pursuant to this plea agreement) may be commenced or reinstated against defendant, notwithstanding the expiration of the statute of limitations between the signing of this plea agreement and the commencement or reinstatement of such prosecution. The defendant agrees to waive all defenses based on the statute of limitations with respect to any prosecution that is not time-barred on the date the plea agreement is signed.

The defendant understands that he is bound by his guilty plea regardless of the immigration consequences of the plea and regardless of any advice the defendant has received from his counsel or others regarding those consequences. Accordingly, the defendant waives any and all challenges to his guilty plea and to his sentence based on those consequences, and agrees not to seek to withdraw his guilty plea, or to file a direct appeal or any kind of collateral attack challenging his guilty plea, conviction or sentence, based on the immigration consequences of his guilty plea, conviction and sentence.

## ACKNOWLEDGMENT OF GUILT AND VOLUNTARINESS OF PLEA

The defendant acknowledges that he is entering into this agreement and is pleading guilty freely and voluntarily because he is guilty. The defendant further acknowledges that he is entering into this agreement without reliance upon any discussions between the Government and

- 7 -

him (other than those described in the plea agreement letter), without promise of benefit of any kind (other than the concessions contained in the plea agreement letter), and without threats, force, intimidation, or coercion of any kind. The defendant further acknowledges his understanding of the nature of the offense to which he is pleading guilty, including the penalties provided by law. The defendant also acknowledges his complete satisfaction with the representation and advice received from his undersigned attorney. The defendant and his undersigned counsel are unaware of any conflict of interest concerning counsel's representation of the defendant in the case.

## SCOPE OF THE AGREEMENT

The defendant acknowledges that this agreement is limited to the undersigned parties and cannot bind any other federal authority, or any state or local authority. The defendant acknowledges that no representations have been made to him with respect to any civil or administrative consequences that may result from this plea of guilty because such matters are solely within the province and discretion of the specific administrative or governmental entity involved. Finally, the defendant acknowledges that this agreement has been reached without regard to any civil tax matters that may be pending or which may arise involving him.

## COLLATERAL CONSEQUENCES

The defendant further understands that he will be adjudicated guilty of each offense to which he has pleaded guilty and will be deprived of certain rights, such as the right to vote, to hold public office, to serve on a jury, or to possess firearms. The defendant understands that pursuant to section 203(b) of the Justice For All Act, the Bureau of Prisons or the Probation Office will collect a DNA sample from the defendant for analysis and indexing. Finally, the defendant understands that the Government reserves the right to notify any state or federal agency by which he is licensed, or with which he does business, as well as any current or future employer of the fact of his conviction.

## SATISFACTION OF FEDERAL CRIMINAL LIABILITY; BREACH

The defendant's guilty plea, if accepted by the Court, will satisfy the federal criminal liability of the defendant in the District of Connecticut as a result of his participation in all conduct set forth in the Indictment in this case.

The defendant understands that if, before sentencing, he violates any term or condition of this agreement, engages in any criminal activity, or fails to appear for sentencing, the Government may void all or part of this agreement. If the agreement is voided in whole or in part, defendant will not be permitted to withdraw his plea of guilty.

**NO OTHER PROMISES**

The defendant acknowledges that no other promises, agreements, or conditions have been entered into other than those set forth in this plea agreement, and none will be entered into unless set forth in writing, signed by all the parties.

This letter shall be presented to the Court, in open court, and filed in this case.

Very truly yours,

DEIRDRE M. DALY
UNITED STATES ATTORNEY

_____
HENRY K. KOPEL
Assistant United States Attorney

The defendant certifies that he has read this plea agreement letter and its attachment(s) or has had it read or translated to him, that he has had ample time to discuss this agreement and its attachment(s) with counsel and that he fully understands and accepts its terms.

_____          4/28/2015
RYAN GEDDES                         Date
The Defendant

I have thoroughly read, reviewed and explained this plea agreement and its attachment(s) to my client who advises me that he understands and accepts its terms.

_____          4/28/15
RICHARD C. MARQUETTE, ESQ.         Date
Attorney for the Defendant

## STIPULATION OF OFFENSE CONDUCT AND RELEVANT CONDUCT

The defendant Ryan Geddes and the Government stipulate to the following offense conduct that gives rise to the defendant's agreement to plead guilty to the indictment:

### Background

From 2005 through and including 2011, Ryan Geddes operated a construction business and incurred a series of business and personal debts, including one business debt in excess of $490,000. Consequently, from late 2005 through 2011 and beyond, Geddes was the subject of one or more lawsuits intended to collect those debts, and intended to identify Geddes's assets available to pay those debts.

### Count One (Bank Fraud Conspiracy)

In or about November of 2005, defendant Ryan Geddes ("Geddes") made arrangements to sell to Thomas Provenzano, a co-conspirator charged in a separate filing, a lakefront residential home located at 27 Palmer Road, Morris, Connecticut (the "27 Palmer Road" property), even though Provenzano lacked the funds and income to finance the purchase. The purpose of the sale was to pay off liens and a mortgage on the 27 Palmer Road property and to provide a source of cash for Geddes, while disguising the true ownership of the property.

The 27 Palmer Road property was formally owned by United Development Group LLC ("UDG"), an entity wholly controlled by Geddes. On or about November 28, 2005, the 27 Palmer Road property was sold from Geddes's UDG entity to Provenzano for $1,154,000.

To facilitate the purchase, Provenzano obtained a mortgage of $923,200 from First Magnus Financial, after signing and submitting a loan application package containing three material, false representations: (1) that Provenzano was employed as the Operations Manager for Elite, a construction company owned and operated by Geddes, when in fact, Provenzano was not employed by Elite or by any other Geddes company; (2) that Provenzano earned $20,000 per month at Elite, for an annual income of $240,000, when in fact, his total earnings were less than $50,000 per year at the time; and (3) that as a condition of receiving the loan, Provenzano would occupy the 27 Palmer Road property, when in fact, Geddes and Provenzano had agreed that Geddes would continue to occupy the property. The loan documents listed a representative of Elite – Geddes's company – as having provided verification for Provenzano's false employment listing. The paperwork for the loan application was prepared by another co-conspirator, Jason Calabrese ("Calabrese"), who knew at the time that Provenzano did not work at Elite and did not earn the $240,000 income listed in the loan application.

The HUD-1 settlement statement for sale of the 27 Palmer Road property required Provenzano to convey a $249,923.12 cash down payment at the closing. But Provenzano never made that payment. Nonetheless, less than a week after the closing, Geddes issued two bank checks to Provenzano, issued in the name of UDG, in the amounts of $100,000 and $6,500.

About a year later, on or about November 21, 2006, Provenzano refinanced the mortgage for the 27 Palmer Road property with World Savings Bank FSB, obtaining thereby a $936,000 mortgage loan. The paperwork for the refinancing loan application was again prepared by Calabrese, and contained at least two material, false representations that Calabrese knew were not true: (1) that Provenzano was employed as the Operations Manager for Elite, a construction company owned and operated by Geddes, when in fact, Provenzano was not employed by Elite or by any other Geddes company; and (2) that Provenzano earned $28,000 per month at Elite, for an annual income of $336,000, when in fact, his total earnings were less than $50,000 per year at the time. As with the 2005 loan application, the refinancing loan documents listed a representative of Elite – Geddes's company – as having provided verification for Provenzano's false employment listing.

Initially, Geddes paid monthly "rent" to Provenzano, which Provenzano used to make the monthly mortgage payments. Within three years, Geddes moved to another home and stopped paying Provenzano. Provenzano stopped paying the mortgage, and the 27 Palmer Road property went into foreclosure. At all relevant times, the 2006 refinancing lender, World Savings Bank FSB, was insured by the Federal Deposit Insurance Corporation. Presently, Wells Fargo Bank holds the 27 Palmer Road mortgage in foreclosure.

Count Three (Mail and Wire Fraud Conspiracy)

In December 2009 meeting, Provenzano told Geddes about a type of scheme to defraud a real estate title insurance company. The scheme involved arranging a straw sale of real property using an incomplete title search, that is, the title search fails to report one or more liens recorded against the property. Later, after the sale, the perpetrators arrange another event, such as a subsequent sale, that triggers a new title search. The new title search turns up the previously-omitted liens, resulting in a claim against and a payout from the title insurance company, equal to the amount of the deliberately omitted liens.

Geddes and Provenzano agreed to conduct such scheme through the property at 66 Donahue Road Extension in Litchfield, Connecticut (the "66 Donahue Road" property), which was formally owned by Donahue Mountain Farm LLC, an entity controlled by Geddes. They further agreed that that the 66 Donahue Road property would be conveyed by a straw sale to Geddes's brother Richard Geddes, and that one of the liens to be omitted from the title search was a judgment lien of more than $400,000, recorded against the property by one of Geddes's creditors.

In January 2010, Provenzano assisted in conducting a title search for the 66 Donahue Road property. On or about February 26, 2010, Geddes reviewed the title search and directed that five liens, totaling more than $990,000, be omitted from the title search document that would be submitted to a title insurer. Specifically, Geddes crossed off each of the following from the title search document: an attachment/judgment lien of more than $490,000; a mortgage of more than $462,000; and three mechanics' liens totaling more than $39,000.

On or about March 25, 2010, at the initiative of Geddes, a straw sale of the 66 Donahue Road property was conducted, specifically, a sale of the property from the Geddes-controlled Donahue Mountain Farm LLC entity, to Geddes's brother, Richard Geddes. Although the mortgage deed listed Richard Geddes as paying $346,500 to buy the property, Richard Geddes later admitted that he paid nothing for the property then or later, and that his brother Ryan Geddes continued to occupy and pay the mortgage for the property.

The title search prepared for that March 25, 2010 closing deliberately omitted all the liens and encumbrances that Geddes had previously crossed out, namely, an attachment/judgment lien of more than $490,000, a mortgage of more than $462,000, and three mechanics' liens totaling more than $39,000, for a total of more than $990,000 in deliberately omitted liens. Based on that fraudulent title search, a title insurance policy was issued to the straw buyer, Richard Geddes. Although no title insurance claim has yet been submitted, the goal of the conspirators after the March 2010 straw sale continued to be, to trigger a need for a new title search, resulting in (1) the discovery of the deliberately-omitted liens, (2) a claim against the title insurer, and a (3) payout on the claim of approximately $990,000. The anticipated payout was expected to be wire-transferred to lienholders in Connecticut and elsewhere from the insurer's Florida headquarters, and the other paperwork for the scheme was expected to be conveyed in part by interstate mail service.

Count Seven (Mail and Wire Fraud Conspiracy)

In May 2009, Geddes made arrangements to transfer the rights to the real property located at 154 Tamarack Drive, Old Forge, New York (the "154 Tamarack Drive" property), from Geddes's UDG entity to an entity controlled by Dustin Whitten known as Inland Forest Properties LLC ("IFP"). Geddes also arranged to construct a vacation residence on the 154 Tamarack Drive property, which he and his family frequently occupied.

On May 5, 2010, Geddes filed a bankruptcy petition in the Connecticut federal bankruptcy court, in which he failed to list the 154 Tamarack Drive property on his schedule of real estate assets; on August 4, 2010, Geddes filed amended asset schedules in that same federal bankruptcy case, in which he again failed to list the 154 Tamarack Drive property on his schedule of real estate assets.

In March 2011, Geddes and Whitten arranged to apply for and to obtain under Whitten's name as the listed "owner," a homeowners insurance policy for the 154 Tamarack Drive property, even though Geddes, not Whitten, continued to reside in and pay the expenses on the property.

In June 2011, as part of Geddes's continuing, federal bankruptcy case, a meeting was held at which the parties discussed Geddes's assets, including his possible ownership of the 154 Tamarack Drive property, and the possibility of selling those assets to help pay off Geddes's creditors. Less than two weeks later, on July 4, 2011, the 154 Tamarack Drive property was destroyed in a fire.

In July and August 2011, Whitten communicated several times with a lender's representative regarding the outstanding mortgage on the 154 Tamarack Drive property, requesting information needed to lodge an insurance claim; Geddes assisted Whitten by authorizing the lender's representative to release such information to Whitten. Many of those communications were conducted via electronic mail. Then on September 21, 2011, representing himself as the owner of the 154 Tamarack Drive property, Whitten executed and thereafter submitted to the Erie & Niagara Insurance Association, two notarized homeowner's insurance claims in the respective amounts of $515,038.50 (for the structure) and $92,974.47 (for personal property), even though Geddes remained the true owner of the property.

After some investigation, the insurance company denied the claims. Had the insurance claims been paid out to Whitten, as Geddes and Whitten had planned, Geddes would have had access to those funds while simultaneously rendering such access much more difficult for his bankruptcy creditors to whom Geddes owed substantial debts.

Other Relevant Conduct

In May of 2010, Geddes and Provenzano were advised that the FBI and the IRS were investigating the sale and financing of the November 2005 sale of the 27 Palmer Road property, including the $249,923.12 cash down payment that Provenzano was supposed to have paid, but had not paid. Geddes and Provenzano thereafter met, created, and back-dated a Promissory Note, to serve as an explanation of why the $249,923.12 cash had never been provided at the closing. The back-dating listed a date on or about that of the November 2005 closing. On or about June 23, 2010, Provenzano met with the investigating FBI and IRS agents and, while claiming that the document had been part of the closing documents for his November 2005 straw purchase of the 27 Palmer Road property, handed over to the agents the false, back-dated Promissory Note.

In connection with Geddes's May 5, 2010 bankruptcy petition, and his August 4, 2010 amended schedules filing, both in Connecticut federal bankruptcy case *In re Ryan Geddes*, No. 10-51034, the sworn asset schedules failed to list both the 154 Tamarack Drive property, and the 66 Donahue Mountain Road property, which latter property had been transferred to Richard Geddes less than six weeks before the bankruptcy petition filing.

The written stipulation above is incorporated into the preceding plea agreement. The defendant and the Government reserve their right to present additional relevant offense conduct to the attention of the Court in connection with sentencing.

_____  _____
RYAN GEDDES                                             HENRY K. KOPEL
The Defendant                                            Assistant United States Attorney

_____
RICHARD C. MARQUETTE, ESQ.
Attorney for the Defendant

## RIDER CONCERNING RESTITUTION

The Court shall order that the defendant make restitution under 18 U.S.C. § 3663A. The order of restitution may include:

1. If the offense resulted in damage to or loss or destruction of property of a victim of the offense, the order of restitution shall require the defendant to:

   A. Return the property to the owner of the property or someone designated by the owner; or

   B. If return of the property is impossible, impracticable, or inadequate, pay an amount equal to:

   The greater of –

   (I) the value of the property on the date of the damage, loss, or destruction; or

   (II) the value of the property on the date of sentencing, less the value as of the date the property is returned.

2. In the case of an offense resulting in bodily injury to a victim –

   A. pay an amount equal to the costs of necessary medical and related professional services and devices related to physical, psychiatric, and psychological care; including non-medical care and treatment rendered in accordance with a method of healing recognized by the law of the place of treatment;

   B. pay an amount equal to the cost of necessary physical and occupational therapy and rehabilitation; and

   C. reimburse the victim for income lost by such victim as a result of such offense;

3. In the case of an offense resulting in bodily injury that results in the death of the victim, pay an amount equal to the cost of necessary funeral and related services; and

4. In any case, reimburse the victim for lost income and necessary child care, transportation, and other expenses incurred during participation in the investigation or prosecution of the offense or attendance at proceedings related to the offense.

The order of restitution has the effect of a civil judgment against the defendant. In addition to the court-ordered restitution, the court may order that the conditions of its order of restitution be made a condition of probation or supervised release. Failure to make restitution as ordered may result in a revocation of probation, or a modification of the conditions of supervised release, or in the defendant being held in contempt under 18 U.S.C. § 3583(e). Failure to pay restitution may also result in the defendant's re-sentencing to any sentence which might originally have been imposed by the Court. See 18 U.S.C. §§ 3614; 3613A. The Court may also order that the defendant give notice to any victim(s) of his offense under 18 U.S.C. § 3555.